COMMONWEALTH of Pennsylvania, Appellee

v.

John E. duPONT, Appellant.

Superior Court of Pennsylvania.

Submitted May 17, 2004.

Filed Sept. 17, 2004.

Reargument Denied Nov. 19, 2004.

Michael J. Malloy, Media, for appellant.

William R. Toal III, Asst. Dist. Atty., Media, for Com., appellee.

Before: BENDER, BOWES, and JOHNSON, JJ.

JOHNSON, J.:

¶ 1 John E. duPont appeals the trial court's denial without a hearing of his Post Conviction Relief Act (PCRA) petition challenging, *inter alia,* the effectiveness of his trial and appellate counsel. We agree with the trial court that duPont's PCRA contentions did not require a hearing. Consequently, we affirm.

¶ 2 This Court, and now the trial court in its thorough opinion denying duPont's PCRA petition without a hearing pursuant to Pa.R.Crim.P. 907, Trial Court Opinion, 9/22/03 (T.C.O.), at 2–10, have provided extensive accounts of the facts and circumstances surrounding duPont's killing of David Schultz on January 26, 1996, and duPont's refusal to surrender to police for days following the killing. Rather than reconstitute prior accounts, we rely principally on the account this Court provided in its opinion affirming duPont's judgment of sentence. *See Commonwealth v. duPont,* 730 A.2d 970 (Pa.Super.1999).

¶ 2 Prior to his arrest in January 1996, appellant resided on an 800–acre estate known as "Foxcatcher Farm" located in Delaware County. For many years appellant operated a wrestling training facility on the premises, and provided housing on the estate to some of the wrestlers who trained at his facility and were members of "Team Foxcatcher," a wrestling team founded by appellant.

¶ 3 People who knew appellant noticed a change in his behavior and emotional state around the time of his mother's death in 1988. Appellant became extremely security conscious, and hired a security firm in 1993 to provide protection on the estate. Despite the firm's efforts implementing extensive security measures, appellant exhibited paranoid fear on several occasions that he was being spied upon and that his life was in danger. Several witnesses also related incidents of appellant's drug and alcohol abuse between 1988 and 1995. In spite of his unusual behavior, however, appellant continued to manage his facility and maintain the daily operations.

¶ 4 Over time appellant developed close relationships with some of the wrestlers at his facility, and came to dislike others. He began to exhibit animosity toward David Schultz, a successful wrestler and also one of the facility's wrestling coaches, sometime in 1995. On the afternoon of January 26, 1996, appellant went to the residence of Mr. Schultz accompanied by one of the estate security consultants, Patrick Goodale. Mr. Schultz was working on his car, but greeted appellant on his arrival. Appellant asked Mr. Schultz, "You got a problem with me?" and shot him three times with a .44

Magnum revolver. He also pointed the weapon at Mr. Goodale and toward Mr. Schultz' wife who was in the house. Appellant then fled in his vehicle to his mansion, reloaded and locked up his weapon, and refused to surrender to police. During the two day standoff which followed, appellant spoke with his attorney on numerous occasions. He was finally apprehended on January 28, 1996 when he left the mansion to attempt a repair of the heating system.

¶ 5 On February 9, 1996 the trial court ordered a competency examination, which was completed on September 9, 1996. Following a hearing on appellant's competency, the trial court determined appellant to be incompetent to proceed to trial by order of September 24, 1996. He was remanded to the Norristown State Hospital for treatment. A second competency hearing was held in December 1996, and the trial court determined that appellant was then competent to proceed to trial, which began in January 1997.

¶ 6 At trial, appellant did not dispute that he shot Mr. Schultz, but put forth a defense of insanity. Following the guilty but mentally ill verdicts, he was sentenced on May 13, 1997 to a term of imprisonment of thirteen to thirty years on the murder conviction and a concurrent term of three to six months on the assault conviction; an order for costs was also imposed.

*Id.* at 973–74 (footnotes omitted).

¶ 3 Following our affirmance of his judgment of sentence, duPont sought review in the Supreme Court of Pennsylvania, which denied his petition. On June 12, 2000, the United States Supreme Court denied his petition for writ of *certiorari.* On March 22, 2001, duPont filed his timely petition seeking relief under the PCRA, 42 Pa.C.S. §§ 9541–46. The trial court entered a notice of intent to dismiss that petition without a hearing, pursuant to Pa.R.Crim.P. 907. In response, duPont sought and was granted leave to amend his PCRA petition, which he filed on December 2, 2002. On August 4, 2003, the trial court again signaled its intent to dismiss the petition without a hearing, which it did by opinion and order dated September 22, 2003. DuPont appeals this order.

¶ 4 Generally stated, our standard of review regarding an order denying a petition under the PCRA requires us to determine whether the record supports the PCRA court's determination and whether the court correctly stated and applied the law. *See Commonwealth v. Allen,* 557 Pa. 135, 732 A.2d 582, 586 (1999). We will not disturb the PCRA court's findings unless those findings are unsupported by the record. *See Commonwealth v. Carr,* 768 A.2d 1164, 1166 (Pa.Super.2001).

¶ 5 DuPont seeks a hearing rather than an outright ruling on the merits, which comports with our approach to such a case. *See, e.g., Commonwealth v. Ford,* 335 Pa.Super. 398, 484 A.2d 406 (1984). Thus, we must consider at the outset the standard against which we measure a dismissal of a PCRA petition without a hearing. Pennsylvania Rule of Criminal Procedure 907 provides as follows:

**Rule 907. Disposition Without Hearing**

¶ 6 Except as provided in Rule 909 for death penalty cases,

(1) the judge shall promptly review the [PCRA] petition, any answer by the attorney for the Commonwealth, and other matters of record relating to the defendant's claim(s). If the judge is satisfied from this review that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral re-

lief, and no purpose would be served by any further proceedings, the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal. The defendant may respond to the proposed dismissal within 20 days of the date of the notice. The judge thereafter shall order the petition dismissed, grant leave to file an amended petition, or direct that the proceedings continue.

\* \* \* \*

■■■ (4) When the petition is dismissed without a hearing, the judge shall issue an order to that effect and shall advise the defendant by certified mail, return receipt requested, of the right to appeal from the final order disposing of the petition and of the time within which the appeal must be taken.

Accordingly, a PCRA court may decline to hold a hearing on the petition if petitioner's claim is patently frivolous or lacks support from either the record or other evidence. *See Commonwealth v. Jordan,* 772 A.2d 1011, 1014 (Pa.Super.2001). "A reviewing court on appeal must examine each of the issues raised ... in light of the record to determine whether the PCRA court erred in concluding that there were no genuine issues of material fact and denying relief without an evidentiary hearing." *Id.*

¶ 7 Given the prolixity of duPont's statement of issues raised on appeal, rather than state them all at once, we begin by quoting only duPont's first question, which asserts numerous bases for relief on the basis of ineffective assistance of trial and appellate counsel. His second and third questions will be quoted later, when we take them up.

I. *Did the Lower Court err in denying Mr. duPont's PCRA petition without a hearing on trial counsels' and appellate counsels' ineffectiveness regarding (1) Trial counsels' failure to adequately request a jury instruction on Mr. duPont's pre-arrest exercise of his right to remain silent and appellate counsels' abandoning the issue that: (a) this evidence should not have been admitted in the Commonwealth's case in chief; (b) trial counsel was ineffective for failure to request a jury instruction on Mr. duPont's right to silence; or (c) if trial counsel preserved the jury instruction issue, in abandoning that issue on appeal. (2) Trial counsel failed to present character evidence and appellate counsel failed to raise trial counsel's ineffectiveness. (3) Trial and appellate counsel failed to adequately investigate the case and fully develop evidence that Mr. duPont took prescribed medication that resulted in psychosis; (4) Trial counsel failed to adequately investigate the role of Patrick Goodale and Aegis Security in the shooting and) of Dr. John O'Brien's involvement in the prosecution. (5) Appellate counsel failed to raise trial counsel's ineffectiveness with regard to the medication issue, the Goodale issue and the O'Brien issue as noted above and, in addition, appellate counsel was ineffective in failing to [word omitted] that a mistrial should have been granted due to the Commonwealth's misrepresentations that it would present direct evidence and witnesses, including Paul McCarthy, of Mr. duPont's use of cocaine.*

Brief for Appellant at 4 (italicization and errors of grammar and typography in original). We pause to note that, in sum, duPont effectively disregards Pa.R.A.P. 2116, which requires that an appellant's Statement of Questions Involved "should

not ordinarily exceed 15 lines [and] must never exceed one page." Although du-Pont's Rule 2116 statement just manages to fit on a single page, the spirit of the rule is violated in that the questions plainly are set in italicized type of smaller size, with narrower line spacing and margins than the rest of the brief. In any case, the lion's share of duPont's prodigious brief is dedicated to the above allegations that trial counsel were serially ineffective, and that direct appellate counsel also were ineffective for failing to raise trial counsels' serial ineffectiveness. Brief for Appellant at 13–60.

■ ¶ 8 Our Supreme Court often has emphasized an appellant's weighty burden in establishing ineffectiveness of counsel under these circumstances, referred to in the discussion that follows as the *"Pierce* test."

When a petitioner alleges trial counsel's ineffectiveness in a PCRA petition, he must prove by a preponderance of the evidence that his conviction or sentence resulted from ineffective assistance of counsel "which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). We have interpreted this provision in the PCRA to mean that the petitioner must show: (1) that his claim of counsel's ineffectiveness has merit; (2) that counsel had no reasonable strategic basis for his action or inaction; and (3) that the error of counsel prejudiced the petitioner—i.e., that there is a reasonable probability that, but for the error of counsel, the outcome of the proceeding would have been different. *See Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999). We presume that counsel is effective, and it is the burden of Appellant to show otherwise.

*Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507, 512 (1999); *see Commonwealth v. Pierce,* 567 Pa. 186, 786 A.2d 203, 213 (2001); *Commonwealth v. Legg,* 551 Pa. 437, 711 A.2d 430, 432–33 (1998). Under the law applicable at the time of du-Pont's post-conviction challenge, where a challenge to the effectiveness of counsel first occurs in the context of a PCRA petition, the petitioner must assert "layered ineffectiveness" of counsel—in effect, that not only was trial counsel ineffective in some material way at trial, but that appellate counsel *also* was ineffective, according to the above three-pronged analysis, in failing to raise on direct appeal some alleged instance of trial counsel's ineffectiveness. *See generally Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1021–23 (2003) (describing what the PCRA requires appellants to plead and prove to establish "layered ineffectiveness" of counsel).

■ ¶ 9 In *McGill,* the Supreme Court constructed an elaborate hypothetical involving a post-conviction petitioner's allegation of ineffectiveness involving trial counsel's (Counsel 1) failure to object to a problematic jury instruction, and appellate counsel's (Counsel 2) failure to raise on direct appeal Counsel 1's failure to object to that instruction. The Court summarized its discussion and holding as follows:

[F]or a petitioner to properly raise and prevail on a layered ineffectiveness claim, sufficient to warrant relief if meritorious, he must **plead, present,** and **prove** the ineffectiveness of Counsel 2 (appellate counsel), which … necessarily reaches back to the actions of Counsel 1 (trial counsel). To preserve (plead and present) a claim that Counsel 2 was ineffective in our hypothetical situation, the petitioner must (1) **plead,** in his PCRA petition, that Counsel 2 was inef-

fective for failing to allege that Counsel 1 was ineffective for not objecting to the erroneous jury instruction, *see Commonwealth v. Marrero*, 561 Pa. 100, 748 A.2d 202, 203, n. 1 (2000); and (2) **present** argument on, i.e., develop, each prong of the *Pierce* test as to Counsel 2's representation, in his brief or other court memoranda. Then, and only then, has the petitioner preserved a layered claim of ineffectiveness for the court to review; then, and only then, can the court proceed to determine whether the petitioner has proved his layered claim.

*McGill*, 832 A.2d at 1022 (emphasis in original). In a more recent case, our Supreme Court reaffirmed a strict reading of *McGill*. *See Commonwealth v. Lopez*, 578 Pa. 545, 854 A.2d 465, 2004 WL 1632646 (2004). The Court in *Lopez* explained that all three prongs of the *Pierce* test must be pleaded and proved as to trial counsel by a PCRA petitioner simply to establish that the layered ineffectiveness allegation regarding trial counsel satisfies the arguable merit prong of *Pierce* as to appellate counsel. *See Lopez*, 854 A.2d 465, 2004 WL 1632646, *2. Assuming the PCRA petitioner carries this burden, he then must plead and argue the second and third *Pierce* prongs as to appellate counsel. *See id.* The implication, of course, is that even where petitioner has a colorable claim of trial counsel ineffectiveness, that is not in itself sufficient to prove appellate counsel's ineffectiveness; appellate counsel nevertheless may have had a reasonable basis for declining to pursue the ineffectiveness claim on appeal, or alternatively, appellate counsel's failure to do so might not have prejudiced petitioner to an extent warranting relief. *Cf. Commonwealth v. Lambert*, 568 Pa. 346, 797 A.2d 232, 244 (2001) ("Claims involving appellate counsel ineffectiveness, moreover, involve concerns unique to appellate practice. Arguably meritorious claims may be omitted in favor of pursuing claims which, in the exercise of appellate counsel's objectively reasonable professional judgment, offer a greater prospect of securing relief.")

¶ 10 In the discussion that follows, we address duPont's ineffective assistance of counsel (IAC) contentions in the order in which he argues them. We have examined in detail the pleading requirements for raising IAC on PCRA review because we find that duPont's brief generally fails to satisfy the *McGill* standard reaffirmed by *Lopez*. Nevertheless, while duPont fails to lead with robustly developed IAC claims against direct appellate counsel, as *Lopez* requires, we construe his arguments as though he has done so for purposes of analysis and review, because we find all of duPont's arguments regarding trial counsel ineffectiveness insufficient to establish *Pierce's* arguable merit prong as to appellate counsel's effectiveness. Consequently, no detailed discussion by duPont as to the basis for appellate counsel's decision not to pursue the allegations of IAC at trial or regarding prejudice on appeal arising from appellate counsel's decision will be required. *See Lopez*, 854 A.2d 465, 2004 WL 1632646, *2 (refusing to remand to enable petitioner to amend pleadings where petitioner fails to plead and prove all three *Pierce* factors as to trial counsel, because petitioner, having thus failed to demonstrate arguable merit as to appellate counsel's conduct, cannot prevail on his layered IAC claim); *cf. Lambert*, 797 A.2d at 243 n. 9 ("[A] court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element ..., the court may proceed to that element first.").

■ ¶ 11 First, duPont alleges IAC in appellate counsel's failure to argue trial counsel's ineffectiveness for failing to request a jury instruction limiting consider-

ation of the prosecution's audiotape evidence of duPont's conversations with police during the stand-off. Brief for Appellant at 17–31. At trial, the jury heard evidence that, after mortally wounding Schultz, duPont returned to his mansion, reloaded and stowed the murder weapon, and instructed his staff not to admit the police onto the property. T.C.O. at 5. Soon thereafter, the police surrounded duPont's estate, and a siege lasting approximately two days ensued. Due to adverse weather, duPont's land-based phone lines were not functioning at the time. The police, however, established a direct phone connection to enable negotiators to communicate with duPont. These conversations, portions of which were taped, featured repeated requests by duPont to speak with counsel and reflected his general unwillingness to discuss the shooting with police. The prosecution sought to introduce these audiotapes during its case-in-chief to preemptively rebut duPont's insanity defense. DuPont's trial counsel objected to their introduction, and immediately requested in the alternative a curative jury instruction directing the jury not to consider the audiotapes as substantive evidence of guilt. The trial court, the Honorable Patricia H. Jenkins, overruled the objection, and belayed her decision whether to charge the jury according to trial counsel's request. Ultimately, however, her jury charge did not feature anything responsive to trial counsel's request. Trial counsel, however, failed to object to the jury charge when given the opportunity. Notes of Testimony, 2/18/97, at 3154 (R. 384a).

¶ 12 Judge Jenkins observed that this presented a novel question of Pennsylvania law. She denied duPont's challenge, however, because she found, by reference to the jurisprudence of other jurisdictions, that rebuttal of an insanity defense constituted a proper purpose for the admission of such evidence. Accordingly, she concluded that the contention lacked arguable merit as to trial counsel. T.C.O. at 29–32. Judge Jenkins alternatively found that trial counsel acted reasonably in not objecting to the jury charge, and that duPont had not been so prejudiced by the evidence as to warrant a favorable IAC ruling. T.C.O. at 33–34.

■ ¶ 13 Although Judge Jenkins, in her responses to several of duPont's IAC allegations, refers to the "reasonable basis" prong under *Pierce*, T.C.O. at 24–28, 33, 36, 38, we will neither examine nor rely on these findings. Our courts repeatedly have held or implied that an attorney's basis for making one strategic or tactical decision over another, whether at trial or on appeal, is not subject to judicial speculation. The reasonableness of an attorney's strategic or tactical decisionmaking is a matter that we usually consider only where evidence has been taken on that point, *see Commonwealth v. DiNicola*, 751 A.2d 197, 202 (Pa.Super.2000); *cf. McGill*, 832 A.2d at 1025 (requiring a hearing as to the adequacy of trial counsel's investigatory efforts on behalf of defendant), which Judge Jenkins' Rule 907 denial of duPont's petition without a hearing precluded. That said, we do not find this error reversible, because failure to satisfy the other *Pierce* prongs is fatal to duPont's arguments, *see Lambert*, 797 A.2d at 243 n. 9.

¶ 14 DuPont's first allegation of IAC may have arguable merit. Furthermore, Judge Jenkins' findings as to counsel's reasonable basis for declining to pursue this claim are inconclusive given the absence of an evidentiary hearing examining counsels' bases for acting as they did. We decide neither of these questions, however, because we find that duPont fails to demonstrate prejudice arising from these actions.

¶ 15 DuPont argues, in his effort to establish prejudice for failure to provide the requested jury instruction, that his

requests for his attorney during the standoff, and his refusal to discuss the case with authorities during this time, were very cold responses to an accusation that he had just shot and killed someone. Under the facts of this case, the jury was certainly free to use this evidence to establish that he was solely a "bad" individual in refutation of his insanity defense.

Brief for Appellant at 31. Judge Jenkins, in her response to this argument, noted that duPont's "own witnesses constantly referred to petitioner's insistence on remaining silent about the shooting." T.C.O., 9/22/03, at 33–34 (citing numerous excerpts of testimony from duPont's battery of expert witnesses in which the experts noted duPont's refusal to discuss the killing). Judge Jenkins found that "any prejudice resulting from references to petitioner's pre-arrest silence and requests to speak with counsel was eradicated by numerous defense references to petitioner's silence ...." T.C.O. at 34 (citing *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 633 (1995) and *Commonwealth v. Gbur,* 327 Pa.Super. 18, 474 A.2d 1151, 1155 (1984) for the proposition that prejudice will not be found where the evidence improperly admitted is cumulative of other properly admitted evidence).

¶ 16 We agree that the evidence in question was cumulative of properly admitted evidence to a degree sufficient to overwhelm any claim of prejudice, but not of that evidence Judge Jenkins emphasized. The question of duPont's conduct during the stand-off immediately following the shooting, in particular his insistence on not discussing the killing and on speaking to his attorney, appears legitimately to implicate the concerns duPont expresses. His silence in the months and years following the killing, as to which his expert witnesses testified and on which Judge Jenkins evidently relied, would not clearly alter the prejudice to duPont of a jury learning of his failure to protest his innocence or otherwise behave as though he was mentally ill in support of his defense strategy at trial. That strategy sought to convince the jury that duPont was legally insane at the time of the killing, not in the months that followed.

¶ 17 Rather than focusing on the ostensibly cumulative evidence found in duPont's experts' considerable testimony on this point, however, we look to another circumstance. The idea of prejudice we are concerned with in this case, and one evidently novel to Pennsylvania courts, is whether the evidence admitted was prejudicial to the success of duPont's asserted insanity defense. Accordingly, we must consider whether duPont's silence and requests for counsel during the stand-off constituted material, prejudicial evidence of his knowledge *at the time of the shooting* that killing David Schultz was wrong. *See* 18 Pa.C.S. § 315(b) (requiring, to establish a defense of insanity, that "at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong."). In considering this question, we must recall that the police did not begin recording their conversations with duPont until noon on the day after the shooting, at which time duPont's conduct might be less probative of his mental state at the time of the shooting.

¶ 18 Even if our answers to the above question fail to obviate the harm of the lack of instruction, we still must consider whether such evidence was evidence of sanity such as might undermine his defense, and, if so, whether its introduction

without a curative instruction was any more damning than the undisputedly admissible evidence of duPont's conduct immediately following the shooting. In the moments and hours following the shooting, duPont hastened from the scene of the crime to his home, where he reloaded and stored the murder weapon. We also must consider whether the audiotape evidence was more damning than the evidence of duPont's refusal to submit himself to police custody immediately after the shooting.

¶ 19 In light of this cumulative evidence of calculated behavior in the wake of the shooting, duPont's argument as to prejudice fails to indicate what singular characteristic of the audiotapes in question constituted evidence sufficiently prejudicial to cast into doubt the legitimacy of the jury's verdict, even absent a limiting jury instruction. *See Stevens*, 739 A.2d at 512 (noting that prejudice exists where petitioner shows a "reasonable probability that, but for the error of counsel, the outcome of the proceeding would have been different."). We find the audiotape evidence introduced at trial to be cumulative, in effect, of the properly admitted evidence of duPont's behavior immediately following the shooting and in the two days that followed. DuPont having failed to satisfy his burden of establishing prejudice deriving from the alleged ineffective assistance of trial counsel, he cannot satisfy *Pierce's* arguable merit prong as to appellate counsel. Consequently, his assertion of IAC on this theory fails.

¶ 20 Next, duPont argues IAC in appellate counsel's failure to raise trial counsel's refusal to discover and submit testimony of duPont's reputation in his community for peacefulness and non-violence. Brief for Appellant at 31–38. We will grant *arguendo* that duPont had four witnesses who were ready, able, and willing to testify to duPont's reputation in the

community for peacefulness and law-abiding behavior around the time of the shooting, and that affidavits to this effect were submitted in conjunction with duPont's amended PCRA petition. The trial court was not so generous, and denied the relief duPont requested on two bases—first, that had trial counsel introduced such evidence, the door would have opened to the prosecution's cross-examination of those character witnesses as to numerous examples of inappropriate and illegal conduct by duPont in the years prior to the shooting. T.C.O. at 37. Second, Judge Jenkins briefly noted that the boilerplate affidavits in which duPont's putative character witnesses asserted the nature of their offered testimony failed to satisfy the governing standard—*i.e.,* by failing specifically to indicate that they "agreed to testify that [duPont] enjoyed a reputation for peacefulness and law abiding behavior." T.C.O. at 37 n. 25. Thus, the trial court saw no need to grant a PCRA hearing on the contribution these witnesses might have made at trial had trial counsel chosen to have them testify. The trial court also noted the irrelevance of *Commonwealth v. Morgan*, 559 Pa. 248, 739 A.2d 1033 (1999), which held that the prosecution cannot cross-examine character witnesses as to instances of criminal conduct for which the defendant was not convicted. T.C.O. at 37. Because this decision post-dated duPont's conviction, the law available to defense counsel at the time of trial did not preclude such cross-examination.

¶ 21 Once again, we are faced with a question as to which Judge Jenkins speculated about trial and appellate counsels' decision-making bases without the benefit of an evidentiary hearing. We have expressed our reservations about this aspect of her ruling. Nonetheless, in order to compel a hearing duPont must demonstrate prejudice arising from trial counsels'

action or omission, as well as prejudice arising from appellate counsels' failure to raise this issue on appeal. *See Commonwealth v. Ervin*, 766 A.2d 859, 865–66 (Pa.Super.2000), *appeal denied*, 568 Pa. 627, 793 A.2d 904, *cert. denied*, 536 U.S. 939, 122 S.Ct. 2620, 153 L.Ed.2d 803 (2002). DuPont again fails to carry his burden.

¶ 22 DuPont makes much of the distinction between the not guilty by reason of insanity verdict he sought and the guilty but mentally ill verdict he received, noting the jury instruction that the former connotes that the defendant is "sick rather than bad," but that the latter requires the jury's finding that the defendant is both "bad and sick." Brief for Appellant at 35. Thus, in light of the extensive evidence of his bad character, duPont argues that it was "imperative that counsel challenge" these attempts to label duPont a "bad" person. Brief for Appellant at 35 (noting evidence admitted including, *inter alia*, that defendant struck a pedestrian with his car and fled the scene, excluded African–Americans from the Foxcatcher wrestling team, drove at great speed in the presence of children, and collected Nazi memorabilia). He cites no authority in support of this proposition, although generally he adverts to authority emphasizing the importance of good character evidence.

¶ 23 Based on the boilerplate affidavits tendered to the trial court, we fail to see how the generic testimony as to duPont's reputation in his community at the time of the shooting—especially in light of the fact that two of the four witnesses in question hail from Florida and Texas, respectively—so plainly would have undermined the jury's verdict that a remand is required. Indeed, we find, to the contrary, that the extensive and specific evidence of duPont's "bad" conduct makes it likely that no prejudice whatsoever occurred from trial coun-

sel's failure to pursue these witnesses' testimony, and in any event not so much as to satisfy the strict standard that governs our determination of prejudice on post-conviction review. We also note the inadequacy of duPont's assertions regarding appellate counsel's failure to pursue this issue; that "there was room in his direct appeal brief," Brief for Appellant at 37, does not bear on our assessment of appellate counsel's conduct, except insofar as it demonstrates that prior appellate counsel did not see fit to use up every page allowed by the Appellate Rules. Having failed to demonstrate prejudice arising from counsel's failure to call character witnesses, duPont has failed to demonstrate the necessity of an evidentiary hearing as to this claim.

■ ¶ 24 DuPont next alleges IAC due to counsel's failure to discover and investigate the possibility that, at the time of the shooting, duPont was under the influence of "a mind-altering medication that had been lawfully prescribed to him by [Bulgarian] medical doctors," and thus could have pursued a defense of involuntary intoxication. Brief for Appellant at 38–44. He argues that there was sufficient evidence available to trial counsel to warrant exploration of the chemical composition and effect of the Bulgarian pharmaceuticals, because he admitted to his doctors prior to trial that he had been taking those drugs prior to the killing. He also maintains that involuntary intoxication is an affirmative defense under Pennsylvania law. Judge Jenkins observed that no appellate decision under Pennsylvania law has affirmatively acknowledged the existence of such a defense, thus duPont could not demonstrate arguable merit under *Pierce*. T.C.O. at 20–28. Judge Jenkins also observed that had trial counsel failed to assert an insanity defense under the circumstances of this case, trial counsel would have been even more exposed to

allegations of ineffective assistance. T.C.O. at 27–28. Because our review of Judge Jenkins' treatment of this issue reveals no error, and because we agree with her conclusions, we reject this challenge on the sound basis of her discussion.

■ ¶ 25 Next, duPont alleges IAC in direct appellate counsel's failure to raise issues of prosecutorial misconduct arising from the Commonwealth's failure to produce a promised witness. Brief for Appellant at 44–51. He claims that the prosecution employed a "bait-and-switch" tactic to bootstrap admission of evidence concerning duPont's alleged cocaine habit, which was prejudicial insofar as it did not bear on duPont's insanity defense. Judge Jenkins ruled that no prejudice occurred as a consequence of her rulings (and curative jury instructions where necessary), and noted in support of her ruling that duPont himself introduced substantial evidence of cocaine use. Given the clarity of Judge Jenkins' comments on this point, as well as the utter lack of authority offered in support of duPont's claim that a hearing is required on this issue, *see* Pa.R.A.P. 2119 (requiring citation to authority in support of appellant's argument), we are content to adopt Judge Jenkins' sound analysis of this issue as our own.

■ ¶ 26 DuPont next asserts IAC in counsel's failure to investigate "the role and the complicity of Patrick Goodale and his company, Aegis Security, in the shooting," Brief for Appellant at 51, which pertains to the possible manslaughter defense duPont alleges might have been asserted at trial. Brief for Appellant at 51–57. Once again, however, aside from cases setting forth the undisputed duty defense counsel has to investigate as fully as possible the various defense theories available, Brief for Appellant at 51 (citing *Davis v. Alabama*, 596 F.2d 1214, 1217–18 (5th Cir. 1979); *Commonwealth v. Bailey*, 480 Pa.

329, 390 A.2d 166 (1978)), duPont fails to argue from binding authority the particular failure of trial counsel in this case that, had it been avoided, would probably have led the jury to a different result than it reached. As the trial court observed, "that trial counsel failed to win an acquittal hardly means his performance was ineffective." T.C.O. at 38 (citing *Commonwealth v. Howard*, 749 A.2d 941, 955 (Pa.Super.2000), *appeal denied*, 564 Pa. 726, 766 A.2d 1244 (2001)). Judge Jenkins found "no reason to believe that a manslaughter defense would have changed the outcome of trial," and indeed characterized this particular theory—either that duPont's animus towards Goodale, or Goodale's own putative but unsubstantiated enmity towards Schultz as conveyed to duPont, somehow prompted the killing—as "outlandish." T.C.O. at 38. We agree with Judge Jenkins, and note as well that here duPont's failure to develop the *Pierce* elements as to appellate counsel's decision not to pursue this course further precludes relief. It is not at all clear that appellate counsel would have acted unwisely in favoring other arguments on appeal than this one.

■ ¶ 27 In his last IAC argument, DuPont contends that trial counsel did not sufficiently investigate misconduct or bias pertaining to the prosecution's expert witness, John S. O'Brien, M.D., J.D. Brief for Appellant at 57–60. Once again his argument contains only a boilerplate assertion of prejudice and fails to refer even once to Pennsylvania precedent in support of his allegations. Moreover, the trial court rejected this claim as previously litigated and decided by this Court. T.C.O. at 39 (citing *duPont*, 730 A.2d at 975–77, 980–81). In light of duPont's failure properly and persuasively to brief this issue, we adopt Judge Jenkins' treatment of this issue as our own. Thus, we reject all of

duPont's assertions of ineffective assistance of counsel.

¶ 28 DuPont raises two other issues, for which he argues more briefly.

II.   Did the Lower Court err in denying Mr. duPont's PCRA petition without a hearing on recently discovered evidence that the Commonwealth violated Mr. duPont's Due Process rights by (1) failing to disclose that Robert Calabrese had repeatedly denied that he had witnessed Mr. duPont ingest cocaine and (2) coercing him into testifying to the contrary.

III.   Did federal due process violations flaw Mr. duPont's sentencing requiring a re-sentencing.

Brief for Appellant at 4.

¶ 29 With his "second" question, duPont contends that the Commonwealth violated the *Brady* rule, *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to provide duPont with evidence in its possession suggesting that Robert Calabrese was coerced into testifying to duPont's alleged drug use. Absent Calabrese's testimony that he had observed duPont use cocaine, duPont argues, the remaining circumstantial evidence of cocaine use "would not have carried much weight with the jury." Brief for Appellant at 65. In response to this allegation, Judge Jenkins moved directly to the question, required by the PCRA, whether the withheld evidence that is allegedly exculpatory "would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). As to this requirement, in effect, duPont's entire argument boils down to this conjecture: in virtue of this evidence (and this evidence only), "in the eyes of the jury, Mr. duPont was now branded as a drug abuser and someone whose mental instability was self induced. Instead of being a blameless victim of mental illness, he was now a cocaine addict whose misfortunes were his own fault." Brief for Appellant at 66.

¶ 30 The trial court focused on duPont's failure to demonstrate prejudice, noting in particular that the defense initiated discussion of duPont's drug use, T.C.O. at 15, that Calabrese's recanted testimony established only that duPont had used cocaine approximately eight years before the killing, T.C.O. at 13, and that several experts and other wrestlers had testified extensively and cumulatively to duPont's cocaine use, T.C.O. at 15–17. The trial court concluded that,

> [i]n view of this vast body of evidence, it is difficult to envisage how exclusion of Calabrese's testimony would have changed the verdict. . . . Calabrese's testimony was a relatively minor piece of evidence in rebutting the defense claim that [duPont] killed Dave Schultz because he suffered from paranoid schizophrenia. The absence of Calabrese's direct testimony, contained in only three pages of transcript, would not have devastated the Commonwealth's case; it would have had virtually no impact.

T.C.O. at 17–18 (internal quotation marks and citations omitted). We agree with this statement and the balance of Judge Jenkins' analysis on this question. T.C.O. at 12–20. Accordingly, we affirm on the rationale there asserted.

¶ 31 Finally, with his "third" question, duPont asserts a due process violation in the fact that his sentence, which was in part predicated on his own experts' unanimous diagnosis that he suffered from paranoid schizophrenia, was constitutionally improper because his disorder was misdiagnosed. Brief for Appellant at 68–69. He contends that, as a matter of fact, based on new expert affidavits, he was

suffering from toxic psychosis caused by his Bulgarian medication. Judge Jenkins found this contention cognizable under the PCRA, *see* 42 Pa.C.S. § 9543(a)(1), insofar as it asserts a constitutional violation during sentencing, but then found it to be waived under § 9543(a)(3), because petitioner failed to raise the claim during sentencing. T.C.O. at 42. She further notes that, while this might fall within duPont's arguments regarding counsel's ineffectiveness, duPont chose not to pursue this angle, instead arguing that the evidence of the toxic effect of scopolamine was newly discovered under the PCRA. T.C.O. at 42 n. 28. Thus, she found that duPont "simply has no excuse for waiting until the PCRA stage before injecting the issue of scopolamine into this case." T.C.O. at 42.

¶ 32 DuPont provides no explanation as to why we should rule otherwise than the trial court. Nor does he refute Judge Jenkins' alternative rejection of duPont's claim that his (ostensibly erroneous) diagnosis was the "central assumption" of the trial court during sentencing, wherein Judge Jenkins emphasized that the central assumption was that "petitioner committed a terrible crime for which he deserved a lengthy period of incarceration. Although the Court considered the fact that petitioner was mentally ill and needed treatment, the specific cause of his mental illness was not material to the Court's sentencing determination." T.C.O. at 43. Once again, we find Judge Jenkins' thorough treatment of this issue—viewed on this last point through the prism of her rejection of the involuntary intoxication defense duPont would assert, T.C.O. at 20–28—more than adequate to the task of supporting her dismissal of duPont's PCRA petition without a hearing pursuant to Pa. R.Crim.P. 907. We therefore adopt her reasoning as to this question.

¶ 33 Our Opinion has addressed each point raised in duPont's Statement of the Questions Involved. Brief for Appellant at 4. We find waived any questions not expressly raised in that Statement pursuant to Pa.R.A.P. 2116(a) ("[O]rdinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby.").

¶ 34 For all the foregoing reasons, we find no cause to grant duPont relief from the trial court's denial of his PCRA petition without a hearing. Accordingly, we affirm the trial court's order effecting that result.

¶ 35 Order **AFFIRMED.**